IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MICHAEL McADOO and KENYA McBEE, individually, and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:14-cv-935 |
| THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Plaintiffs Michael McAdoo and Kenya McBee, former student-athletes at the University of North Carolina at Chapel Hill ("UNC-Chapel Hill"), initiated this putative class action lawsuit, pursuant to 28 U.S.C. § 1332, against UNC-Chapel Hill alleging various state law claims. UNC-Chapel Hill moved to dismiss this action based on a number of defenses, including lack of subject matter jurisdiction and Eleventh Amendment immunity. (ECF No. 14; ECF No. 15 at 10–11.) In response, Plaintiffs requested leave to conduct jurisdictional discovery. By Order, dated June 23, 2016, the Court allowed limited jurisdictional discovery and further ordered supplemental briefing solely related to the issue of jurisdiction. (ECF No.

40.)  For the reasons that follow, the Court grants UNC-Chapel Hill's Motion to Dismiss, for lack of subject matter jurisdiction.[1]

## I.    BACKGROUND

Plaintiffs, in their Amended Complaint ("Complaint"), describe a systemic failure to educate student-athletes at UNC-Chapel Hill from 1993 to 2011. (ECF No. 4 ¶¶ 1, 10.)  They allege that "[s]tudent-athletes were disproportionately funneled into a 'shadow curriculum' of bogus courses" in the Department of African and Afro-American Studies. (Id. ¶ 22.)  Plaintiffs claim UNC-Chapel Hill deprived them of the education they were promised. (See id. ¶¶ 36, 88.)  They assert six state law claims: (1) breach of contract, (2) breach of fiduciary duty, (3) unfair and deceptive trade practices, (4) fraud in the inducement, (5) constructive fraud, and (6) fraudulent concealment. (Id. at 24–32.)  UNC-Chapel Hill moves to dismiss the claims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  UNC-Chapel Hill argues, among other things, that the Court lacks subject matter jurisdiction, the University is immune from suit under the Eleventh Amendment, Plaintiffs lack standing, Plaintiffs filed their claims outside of the relevant statutes of limitation, and Plaintiffs have otherwise failed to state claims upon which relief can be granted. (See ECF No. 15 at 10–11, 16, 19, 25.)

## II.    SUBJECT MATTER JURISDICTION

Before this Court can address any of Plaintiffs' claims, it must first determine whether it has subject matter jurisdiction over this action.  See Elyazidi v. SunTrust Bank, 780 F.3d

---

[1] Also before the Court are Plaintiffs' Motion to File Second Amended Complaint (ECF No. 19) and UNC-Chapel Hill's Motion to Strike (ECF No. 31).  Because the Court lacks subject matter jurisdiction over this action, these motions will be denied as moot.

Case 1:14-cv-00935-LCB-JLW   Document 59   Filed 03/29/17   Page 2 of 23

227, 232 (4th Cir. 2015) (describing subject matter jurisdiction as a "threshold issue" that must be addressed before reaching the merits). Subject matter jurisdiction relates to the court's power to hear a case. Holloway v. Pagan River Dockside Seafood, Inc., 669 F.3d 448, 453 (4th Cir. 2012). A motion under Rule 12(b)(1), which governs dismissal for lack of subject matter jurisdiction, raises the question of "whether [the plaintiff] has a right to be in the district court at all and whether the court has the power to hear and dispose of [the] claim." Id. at 452. "The burden of establishing subject matter jurisdiction rests with the plaintiff." Demetres v. East West Constr., Inc., 776 F.3d 271, 272 (4th Cir. 2015). When evaluating a Rule 12(b)(1) motion to dismiss, the court may consider evidence outside the pleadings and should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). "[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006).

Because Plaintiffs assert only state law claims in this action, the sole basis upon which they can claim federal subject matter jurisdiction is diversity of citizenship. Diversity jurisdiction exists when a case is between "citizens of different States" and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a). UNC-Chapel Hill argues that this case is not between "citizens of different States" because the University is not a "citizen" of any state. Its argument stems from the well-established principle that a state is not a "citizen" for purposes of diversity jurisdiction—a principle that also extends to any public entity that is "the arm or alter ego of the State." S.C. Dep't of Disabilities & Special Needs v. Hoover Universal,

Inc., 535 F.3d 300, 303 (4th Cir. 2008) (quoting Moor v. Cty. of Alameda, 411 U.S. 693, 717 (1973)). Because the requirements of diversity jurisdiction cannot be satisfied when any party is not a "citizen," the jurisdictional issue in this case turns on whether UNC-Chapel Hill is an arm or alter ego of the State of North Carolina.

## A. Courts Have Historically "Treated" the University of North Carolina As An Arm of the State[2]

The Fourth Circuit has not definitively held that the University of North Carolina ("UNC") is an arm or alter ego of the State, though it has treated UNC as such, and numerous district courts have either specifically held or merely assumed that UNC and its constituent universities are arms and alter egos the State. In Huang v. Board of Governors of the University of North Carolina, the Fourth Circuit held that UNC could not be sued for money damages because the State had not waived its Eleventh Amendment immunity. 902 F.2d 1134, 1139 (4th Cir. 1990). By extending the State's Eleventh Amendment protection to UNC, the Fourth Circuit necessarily assumed that UNC was an arm or alter ego of the State. See Md. Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 263 (4th Cir. 2005) (citing Huang as an example of a case in which the Fourth Circuit treated a public university as an arm of the state). A district court in this circuit, however, squarely addressed the issue in Roberson v. Dale, 464 F. Supp. 680 (M.D.N.C. 1979). Considering a set of factors similar to the factors later articulated by the Fourth Circuit, the Court held in Roberson that UNC and UNC-Chapel Hill are alter egos of the State of North Carolina and therefore not "citizens" for purposes of

---

[2] As explained in the Court's Order granting jurisdictional discovery, the Court considers the UNC system as a whole when conducting the arm-of-the-state analysis. (See ECF No. 40 at 4); see also Bd. of Governors of Univ. of N.C. v. U.S. Dep't of Labor, 917 F.2d 812, 816 (4th Cir. 1990).

diversity jurisdiction. Id. at 686, 689; see also Webb v. Univ. of N.C. at Chapel Hill, No. 1:15cv268-LCB-JEP, ECF No. 13 at 8 (M.D.N.C. Mar. 30, 2016) (citing Roberson and holding that UNC-Chapel Hill is an "alter ego of the State of North Carolina" and is therefore not a person within the meaning of § 1983), aff'd per curiam, No. 16-1481, 2017 WL 35798 (4th Cir. Jan. 4, 2017).  Further, like the Fourth Circuit in Huang, courts in this district have also treated UNC and its constituent universities as arms or alter egos of the State.  See, e.g., Costello v. Univ. of N.C. at Greensboro, 394 F. Supp. 2d 752, 756 (M.D.N.C. 2005); Hooper v. North Carolina, 379 F. Supp. 2d 804, 812 (M.D.N.C. 2005); Alston v. N.C. A & T State Univ., 304 F. Supp. 2d 774, 782 (M.D.N.C. 2004); Bd. of Governors of the Univ. of N.C. v. Helpingstine, 714 F. Supp. 167, 174–75 (M.D.N.C. 1989).  This treatment of UNC and its constituent institutions is consistent with numerous cases holding that various state universities are arms or alter egos of the state.  See, e.g., Md. Stadium Auth., 407 F.3d at 256, 262–63, 265 (stating that courts are "[a]lmost universal[]" in deciding that state universities are arms of the state and, after evaluating the University System of Maryland, holding that it is an alter ego of Maryland); Richardson v. S. Univ., 118 F.3d 450, 453–56 (5th Cir. 1997) (noting that the majority of decisions have concluded that state universities are arms of the state and concluding, after evaluating Southern University and A&M College, that it is an arm of the State of Louisiana); Watson v. Univ. of Utah Med. Ctr., 75 F.3d 569, 575 (10th Cir. 1996) ("Our cases have consistently found state universities are arms of the state.").

The cases cited above, however, are not controlling on the issue of whether UNC is an arm or alter ego of the State of North Carolina.  Though this Court directly addressed the issue in Roberson, it did so prior to Ram Ditta v. Maryland National Capital Park and Planning

5

Commission, in which the Fourth Circuit articulated the specific factors to be considered along with analysis on how courts should weigh any given factor. 822 F.2d 456, 457–460 (4th Cir. 1987). Also, while a district court decision may be persuasive, it is not binding even within the same district. See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 430 n.10 (1996) (stating that each judge within a district "sits alone and renders decisions not binding on the others"). Nor does the Fourth Circuit's decision in Huang resolve the issue, as the court assumed UNC was entitled to the State's Eleventh Amendment immunity without squarely addressing whether UNC was an arm or alter ego of the State. See Brecht v. Abrahamson, 507 U.S. 619, 631 (1993) (explaining that the Court was free to address an issue on the merits when it had "never squarely addressed the issue" but rather assumed its answer); Fernandez v. Keisler, 502 F.3d 337, 343 n.2 (4th Cir. 2007) ("We are bound by holdings, not unwritten assumptions."); accord Passmore v. Astrue, 533 F.3d 658, 660 (8th Cir. 2008) ("[W]hen an issue is not squarely addressed in prior case law, we are not bound by precedent through *stare decisis*."); Sakamoto v. Duty Free Shoppers, Ltd., 764 F.2d 1285, 1288 (9th Cir. 1985) ("[U]nstated assumptions on non-litigated issues are not precedential holdings binding future decisions."). Finally, despite overwhelming authority that state universities are typically arms or alter egos of the state, the Fourth Circuit has held that "each state university must be evaluated in light of its unique characteristics." Md. Stadium Auth., 407 F.3d at 263 (quoting Univ. of R.I. v. A.W. Chesterton Co., 2 F.3d 1200, 1204 (1st Cir. 1993)).

In light of the preceding discussion and this Court's obligation to determine whether it possesses subject matter jurisdiction before proceeding, the Court finds it necessary to

squarely address whether UNC-Chapel Hill is an arm or alter ego of the State of North Carolina, utilizing the factors articulated by the Fourth Circuit.

### B. The Arm-of-the State Factors Must be Applied to UNC

Plaintiffs have sued UNC-Chapel Hill in this action. Plaintiffs' argument in support of subject matter jurisdiction, however, is based almost entirely on an arm-of-the state analysis focused on a single department at UNC-Chapel Hill, the Department of Athletics. (See generally ECF No. 57 at 4, 19–28.) Plaintiffs argue that the allegations in this case center on UNC-Chapel Hill's Department of Athletics and thus the financial independence of the Department is relevant and essential to the jurisdictional issues in this case. (Id. at 4.) According to Plaintiffs, the Department of Athletics is supported wholly by private funding and operates as an autonomous entity not subject to State oversight. (See id. at 5–11, 12–15, 20–21.) Plaintiffs, however, cite no legal authority to support the arm-of-the state focus that they urge this Court to consider.

UNC-Chapel Hill counters that Plaintiffs improperly attempt to tie their arm-of-the state analysis to the relief they seek rather than to the nature of the entity alleged to be an arm-of-the state "as Eleventh Amendment jurisprudence demands." (ECF No. 58 at 29; see also id. at 2–3.) Further, it argues that, "there is no legal support for separating the Department [of Athletics] from [UNC-Chapel Hill,] much less the UNC system as a whole, when conducting the arm-of-the-state analysis." (Id. at 29–30.) This Court agrees with UNC-Chapel Hill.

Contrary to Plaintiffs' assertion that the "allegations in this case center on the UNC Athletics Department," (ECF No. 57 at 4), Plaintiffs' claims, as UNC-Chapel Hill points out,

"only tangentially involve athletics;" rather their claims "center on allegedly irregular *classes* offered by an *academic* department" at UNC-Chapel Hill, (ECF No. 58 at 28). Further, Plaintiffs allege in their Complaint that UNC-Chapel Hill is systematically depriving Plaintiffs of the education they were promised, (ECF No. 4 ¶¶ 9–10), and in their brief, characterize this case as involving "the largest academic fraud in U.S. history," (ECF No. 57 at 1). Thus, it appears that Plaintiffs' claims are centered on the core mission of UNC and its constituent institutions including UNC-Chapel Hill—that of providing quality educational services for the State of North Carolina, which includes, but is not limited to, athletics. See W. Va. Univ. Bd. of Governors v. Rodriguez, 543 F. Supp. 2d 526, 531, 535 (N.D. W. Va. 2008) (explaining that providing education is a proper function of state government and "the carrying on of an athletic program is an important and necessary element in the educational process, especially at institutions of higher learning" (quoting Kondos v. W. Va. Bd. of Regents, 318 F. Supp. 394, 396 (S.D. W. Va. 1970), aff'd per curiam, 441 F.2d 1172 (4th Cir. 1971))).

In addition, courts have rejected efforts to base an arm-of-the-state analysis, when evaluating Eleventh Amendment Immunity, on a single department within a university, even where the department receives substantial private funds, as Plaintiffs argue is the case here. See, e.g., Miranda v. Univ. of Md., No. AW-04-2609, 2005 U.S. Dist. LEXIS 3944, at *18–19 (D. Md. Feb. 9, 2005) (rejecting the plaintiff's argument that the Eleventh Amendment does not apply to a university because the department providing dining services to students and the university community was self-supported by non-public funds); Hoeffner v. Univ. of Minn., 948 F. Supp. 1380, 1388 (D. Minn. 1996) (rejecting the plaintiff's argument that the proprietary functions of the university's hospital and clinic altered the university's relationship with the

8

state in a manner sufficient to have Eleventh Amendment significance because the plaintiff sued the university as a whole and, thus, the relevant inquiry "concentrate[s] only upon the State's control over the *operative State entity* [the university], and the impact that an award of damages would have upon the State's treasury" (emphasis added)); see also Watson, 75 F.3d at 575–77 (noting that, despite receiving minimum funding from the state, the university medical center was not autonomous from the university or the state, but rather an integral part of the university, an arm of the state, and thus entitled to Eleventh Amendment immunity).

Finally, the Fourth Circuit has recognized that the UNC system "is, by definition, one agency," rather than "separate, independent agencies." Bd. of Governors of Univ. of N.C. v. U.S. Dep't of Labor, 917 F.2d 812, 816 (4th Cir. 1990). To adopt Plaintiffs' argument that the arm-of-the-state analysis should be applied solely to the Department of Athletics, this Court would essentially treat the Department as an entity separate and distinct from UNC-Chapel Hill and the UNC system, which it is not. As UNC-Chapel Hill argues, "[s]overeignty of the UNC system as a whole cannot reasonably hinge on the alleged involvement of a single department of one UNC constituent institution." (ECF No. 58 at 2.)

Plaintiffs have failed to persuade this Court that it should base its arm-of-the-state analysis on facts related exclusively to the Department of Athletics at UNC-Chapel Hill. The Court will, therefore, consider facts relevant to the UNC system, including UNC-Chapel Hill, in its arm-of-the-state analysis. This Court will not consider the arm-of-the-state factors in the context of a single department at UNC-Chapel Hill as urged by Plaintiffs.

## C. Arm-of-the-State Factors Applied

To determine whether a public entity is an arm or alter ego of the state, and therefore not a "citizen" for purposes of diversity jurisdiction, the Fourth Circuit has articulated a four-factor test:

> (1) whether any judgment against the entity as defendant will be paid by the State . . . ;
>
> (2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions;
>
> (3) whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and
>
> (4) how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State.

United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 804 F.3d 646, 650–51 (4th Cir. 2015) (quoting S.C. Dep't of Disabilities, 535 F.3d at 303), cert denied, 137 S. Ct. 617 (2017). While these factors are critical to the Court's analysis, it is not necessarily limited only to the four factors. Ram Ditta, 822 F.2d at 457–58. "Because the question of whether an entity is an alter ego of the state is a highly fact-intensive undertaking," a court should go "into some detail regarding the [entity's] structure and operations." Md. Stadium Auth., 407 F.3d at 257. As earlier recognized, the Court in Roberson discusses, in significant detail, UNC and UNC-Chapel Hill's character and structure as set forth in the North Carolina statutes. See 464 F. Supp. at 687–88. This Court finds it unnecessary to restate what has been carefully described in Roberson here, except where such discussion is specifically related to the four critical arm-of-the-state factors articulated by the Fourth Circuit.

10

1.  <u>Judgment against UNC-Chapel Hill will impact the State Treasury</u>

Generally, the factor which is considered the most important in the arm-of-the-state analysis is whether a judgment against UNC will be paid by the State. <u>See</u> <u>Md. Stadium Auth.</u>, 407 F.3d at 261. There are some courts, however, that have held that this factor does not have the same level of importance in a diversity case such as this one. <u>See</u> <u>W. Va. Univ. Bd. of Governors</u>, 543 F. Supp. 2d at 530 ("The first factor, effect on the treasury, is often treated as a controlling factor for Eleventh Amendment immunity analysis. In the diversity analysis, however, effect on the treasury lacks the same level of importance." (citations omitted)). Nevertheless, this factor considers the state's legal liability for a judgment, as well as the practical effect of a judgment on the state treasury. <u>Oberg</u>, 804 F.3d at 651. An entity may, therefore, be an arm of the state, even if not legally liable, where the state is functionally liable for the judgment. <u>See id.</u> at 657–58.

With respect to legal liability, the parties have not cited any state statute claiming or disclaiming liability for a judgment against UNC.[3] It is equally important to recognize, however, though no law imposes liability on the State *per se* for a judgment, nor does any "provision in the entire chapter [116] or any other chapter of North Carolina's statutes exempts the State from UNC's general debts or liabilities." <u>Roberson</u>, 464 F. Supp. at 687. The focus of this Court's analysis with respect to this factor therefore will be how a judgment against UNC will impact the State Treasury, *i.e.* its functional liability. A state is functionally

---

[3] As noted in <u>Roberson</u>, North Carolina "has separated itself from UNC for the specific purpose of avoiding liability for the university's management of revenue bonds. There is no other such disclaimer of liability anywhere else in [N.C. Gen. Stat.] § 116-1 *et seq.*" 464 F. Supp. at 688.

liable for a judgment against an agency "[w]here an agency is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries." Oberg, 804 F.3d at 658 (alteration in original) (quoting Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 50 (1994)). Courts consider the practical impact of a judgment on the state treasury by examining, among other things, treatment of the entity's funding and revenues. See Md. Stadium Auth., 407 F.3d at 263–64; Ristow v. S.C. Ports Auth., 58 F.3d 1051, 1052–54 (4th Cir. 1995). A state is also functionally liable "if the funds available to pay any judgment effectively belong to the state rather than the agency." Oberg, 804 F.3d at 658.

The North Carolina General Assembly ("General Assembly") is constitutionally mandated to maintain a public system of higher education, comprised of UNC, free from expenses to the citizens of North Carolina, to the extent practicable. N.C. Const. art. IX, §§ 8, 9. To fund this mission, UNC and its constituent institutions, including UNC-Chapel Hill, are allocated substantial annual state appropriations. (Pruit Decl. ¶ 24, Ex. A, ECF No. 58-1; Fajack Decl. ¶ 12, Ex. B, ECF No. 58-2); see N.C. Gen. Stat. §§ 116-11(9)a, 116-30.2(a); see generally N.C. Gen. Stat. §§ 143C-3-3(b), 143C-3-5(a). The Board of Governors of UNC ("BOG") is charged with preparing "a single, unified recommended budget" for presentation to and approval by the Governor and enactment by the General Assembly. N.C. Gen. Stat. § 116-11(9)(a); see N.C. Gen. Stat. §§ 143C-3-3(b), 143C-3-5(a); (see also Fajack Decl. ¶ 21; Pruitt Decl. ¶ 8). The unified budget includes a request for direct state appropriations. (See Pruitt Decl. ¶ 24; Fajack Decl. ¶¶ 12, 21); see also N.C. Gen. Stat. § 116-11(9)a–b. The General Assembly allots appropriations to the BOG via an established process throughout the year, upon receipt of regular reporting that certifies the funds are used for authorized purposes.

12

(Pruitt Decl. ¶ 25; Fajack Decl. ¶ 13.) The BOG then allocates the appropriations to UNC constituent institutions. (See Pruitt Decl. ¶ 25.) These direct state appropriations are regulated by the State, held in a state administered account in the name of the State Treasurer, and are subject to automatic reversion to the State Treasury, if unspent. See N.C. Gen. Stat. § 143C-1-2(b), N.C. Gen. Stat. § 147-77; (see also Pruitt Decl. ¶ 27; Fajack Decl. ¶ 13). More than half of North Carolina's $20 billion budget supports education, and UNC receives approximately $2.6 billion, nearly 12% of the State's budget. (Pruitt Decl. ¶ 24.) UNC-Chapel Hill receives 15 to 20% of its annual funding from direct state appropriations, which in 2015 was nearly $480 million. (Fajack Decl. ¶ 12.)

UNC constituent institutions also generate revenue from other sources. The institutions generate revenue through tuition and student fees (e.g., health services and extracurricular activities), the operation of auxiliary enterprises (e.g., student housing and food services), and research grants and contracts from governmental and private organizations. (Fajack Decl. ¶¶ 14–16, 19; Pruitt Decl. ¶¶ 28, 30–31.) In addition, UNC constituent institutions receive gifts and donations. (See also Fajack Decl. ¶ 20; Pruitt Decl. ¶ 34.) The General Assembly has enacted legislation requiring each board of trustees to establish and maintain an endowment fund for such gifts. See N.C. Gen. Stat. § 116-36(a), (j). Unlike state appropriations and funds generated through tuition, which are considered "central, unrestricted funds," (Fajack Decl. ¶ 38), funds from these other sources are generally restricted to particular uses and thus not available for general institutional purposes, (see id. ¶¶ 15–16, 19–20; Pruitt Decl. ¶¶ 30–31, 34); see generally N.C. Gen. Stat. §§ 116-36(e)–(g); 116-36.1(a), (d), (f) (g); Univ. of N.C. Policy Manual, §§ 600.2.1, 600.2.4 (setting forth regulations, policies,

and procedures at the direction of the General Assembly for the endowment of each constituent institution and for the administration of institutional trust funds, special trust funds, and student auxiliary enterprise funds for each UNC constituent institution).

Further, the State and BOG regulate funds generated by intercollegiate athletics at UNC institutions, classifying them as "special funds," see N.C. Gen. Stat. § 116-36.2. Each institution's chancellor is responsible for "the custody and management of the special funds of that institution." Id. The statute provides that such funds are appropriated and may only be used as authorized by statute and policies adopted by the BOG.[4] Id. Additionally, surplus funds generated by the Department of Athletics at UNC-Chapel Hill are held in a state-administered account for the Department's use. (Fajack Decl. ¶ 17.)

Of particular importance here is the manner in which a legal judgment against UNC-Chapel Hill would be paid and specifically whether such payment would impact the State Treasury. UNC-Chapel Hill does not maintain legal reserves, and legal judgments are considered unbudgeted expenses. (Fajack Decl. ¶ 33.) Typically, unbudgeted expenses are first paid from direct state appropriations or available unrestricted, general funds. (Id.; Pruitt Decl. ¶ 35.) These funds "could include the unrestricted portion of [the] previous year's budget surplus, if any, as well as funds available as a result of any lapsed salaries or other eliminated expenses throughout the year." (Fajack Decl. ¶ 33.) As such, these funds would have to be drawn from accounts held in the name of the State Treasurer to satisfy a judgment against UNC-Chapel Hill. (Id.) Given that portions of unrestricted funds are designated to

---

[4] The BOG has adopted policies around how such funds are deposited, invested, and insured. See Univ. of N.C. Policy Manual, § 600.2.4(III).

future uses, *i.e.*, to pay incoming faculty salaries or to purchase school equipment, the amount of unrestricted funds available at UNC-Chapel Hill from which a judgment could be paid could vary from zero to millions of dollars. (Id. ¶ 34.) If UNC-Chapel Hill was unable to satisfy a judgment, it could request assistance from the State Contingency and Emergency Fund; however, not only is there no precedent for such a request from a UNC system institution, any payment out of the fund would come from amounts appropriated by the General Assembly. (Fajack Decl. ¶ 36 (citing N.C. Gen. Stat. § 143C-4-4(a) ("The Contingency and Emergency Fund is established within the General Fund. The General Assembly shall appropriate a specific amount to this fund for contingencies and emergencies . . . .")).)

To date, there is no evidence that any private foundation or endowment has ever volunteered to pay a judgment on behalf of UNC-Chapel Hill, and there is no authority to require payment from such sources. (See Fajack Decl. ¶ 37; Pruitt Decl. ¶ 39.) While a UNC constituent institution could request assistance from such third party to satisfy a judgment, the third party could not be compelled by the institution, the BOG, or the General Assembly to provide such assistance. (Pruitt Decl. ¶ 39.) Thus, a judgment against UNC-Chapel Hill or a constituent institution with little to no available unrestricted funds on hand would likely require immediate action from the BOG or the State legislature, in the form of a reallocation from another constituent institution or a state appropriation. (See Pruitt Decl. ¶¶ 35–37.)

For the reasons outlined, it is undeniable that a legal judgment against UNC-Chapel Hill would directly impact the State Treasury. The Court, therefore, concludes that the State of North Carolina is functionally liable for a judgment against UNC and its constituent

institutions. This factor weighs in favor of finding that UNC and its constituent institutions, including UNC-Chapel Hill, are arms or alter egos of the State of North Carolina.

Although a finding of functional liability typically ends the arm-of-the-state inquiry, Oberg, 804 F.3d at 651, the Court will nevertheless evaluate the remaining factors.

### 2. UNC nor UNC-Chapel Hill is autonomous from the State

The second arm-of-the-state factor considers the degree of autonomy UNC exercises, including who appoints UNC's directors or officers, who funds UNC, and whether the State retains a veto over UNC's actions. Oberg, 804 F.3d at 668. Also relevant is whether UNC "has the ability to contract, sue and be sued, and purchase and sell property, and whether it is represented in legal matters by the state attorney general." Id. An entity may retain some operational independence in its day-to-day activities, yet still be considered an arm of the state. See Md. Stadium Auth., 407 F.3d at 264.

Perhaps one of the most significant limits on UNC's autonomy, in addition to its reliance on substantial state appropriations to carry out its mission, as discussed earlier, is the election of the BOG. The BOG's membership, removal, and meeting requirements are prescribed by state statute. N.C. Gen. Stat. §§ 116-6, 116-7, 116-9. The General Assembly appoints members to the BOG and has recently enacted legislation reducing the size of the BOG from 32 members to 24 members.[5] See N.C. Sess. Laws 2017-1 (reducing the number of members of the BOG elected each regular session from sixteen to twelve). The General Assembly has also assigned responsibility for UNC's general supervision, management, and

---

[5] Prior to the enactment of this legislation, the BOG was comprised of 32 members. See N.C. Gen. Stat. § 116-6(a); (Pruitt Decl. ¶ 7).

governance to the BOG and defines the BOG's duties to include, among other things, governing the constituent institutions, determining their functions, education activities and academic programs, and setting tuition and enrollment. See N.C. Gen. Stat. § 116-11; (see also Pruitt Decl. ¶ 8).

The BOG may delegate certain authority to constituent institutions' boards of trustees. See N.C. Gen. Stat. § 116-11(13). This delegation may be revised or withdrawn at any time. See id.; (see also Pruitt Decl. ¶ 12). In addition, both the Governor and the BOG control the boards of trustees at each constituent institution, with the BOG appointing eight of the thirteen members and the Governor appointing four members.[6] N.C. Gen. Stat. § 116-31(d). Though the General Assembly has delegated governance of UNC to the BOG, UNC remains subject to the control and veto power of the General Assembly which can withdraw its delegation of authority at any time. (Pruitt Decl. ¶¶ 21–22 (citing recent examples of the General Assembly's overriding the BOG).)

Specifically, the State controls UNC and its constituent institutions in the following ways:

1. The General Assembly or other state officials must approve certain bonds for UNC projects, (see Fajack Decl. ¶¶ 26, 28), and most acquisitions or dispositions of real property, (see Kidd Decl. ¶¶ 9–11, 13–15, Ex. C, ECF No. 58-3; Pruitt Decl. ¶ 15);

2. Each constituent institution's spending authority for the procurement of goods and services is capped by statute and subject to regulation by the BOG, (see Fajack Decl. ¶ 22 (noting that UNC-Chapel Hill's spending authority is capped at $500,000)); N.C. Gen. Stat. § 116-31.10;

---

[6] The president of student government at each constituent institution serves in an ex officio capacity. N.C. Gen. Stat. § 116-31(d).

3. Before securing private counsel in litigation, UNC is required to obtain written permission from the state Attorney General, N.C. Gen. Stat. § 114-2.3(a), and all UNC legal settlements of $75,000 or more must receive the written opinion of the Attorney General, § 114-2.4(a), and must also be submitted for approval to the Committee on University Governance, Univ. of N.C. Policy Manual § 200.5;

4. The BOG's power to, among other things, acquire, maintain, and dispose of real property and services is governed by statute, see N.C. Gen. Stat. § 116-13(a);

5. State statute allocates property to UNC-Chapel Hill, which is considered "State lands," for UNC-Chapel Hill's use, (Kidd Decl. ¶¶ 9–12); see N.C. Gen. Stat. § 146-64(6); N.C. Gen. Stat. § 143-341(4); (see also Kidd Decl. ¶¶ 9–10, 18 (explaining that the state owns almost all land and structures comprising UNC-Chapel Hill and that profits from the sale of such property benefit the State Treasury));

6. UNC and UNC-Chapel Hill are subject to numerous laws that apply only to state entities, (Pruitt Decl. ¶¶ 14, 20 (noting that UNC and its employees are subject to Chapters 116 (Higher Education), 126 (State Human Resources Act), 132 (Public Records), 143 (State Departments, Institutions, and Commissions), 143(C) (State Budget Act), 146 (State Lands), and 147 (State Officers)); and

7. UNC-Chapel Hill is restricted in its ability to purchase insurance and most of the insurance it may secure is provided by the State, (Fajack Decl. ¶ 30).

Further evidence of state control is demonstrated through recent legislation by the General Assembly overriding decisions by the BOG. (See Pruitt Decl. ¶ 21 (overriding the BOG's proposed tuition increase by mandating in-state tuition remain fixed or decrease during a student's four-year enrollment (citing Current Operations and Capital Improvements Appropriations Act of 2016, Sess. Laws 2016-94, Part XI § 11.4(a)); id. ¶ 22 (reimbursing UNC-Chapel Hill for the BOG's assessment of a fine for exceeding the BOG's 18% limit on the admission of out-of-state students (citing Current Operations and Capital Improvements Appropriations Act of 2016, Sess. Laws 2016-94, Part XI § 11.9)).)

The Court concludes that UNC-Chapel Hill and UNC are not autonomous from the State. Despite exercising some level of autonomy in carrying out day-to-day operations, UNC and its constituent institutions remain subject to the control and veto power of the General Assembly. Thus, this factor likewise weighs in favor of finding that UNC and its constituent institutions, including UNC-Chapel Hill, are arms or alter egos of the State of North Carolina.

3. <u>UNC and UNC-Chapel Hill are engaged in State concerns</u>

The third arm-of-the-state factor considers whether UNC is involved with statewide concerns, as compared to local concerns. "The University of North Carolina is . . . dedicated to the service of North Carolina and its people." N.C. Gen. Stat. § 116-1(b). Comprised of 17 institutions located throughout North Carolina, UNC's mission is to address the educational needs of individuals and society to enrich the quality of life in the State. §§ 116-4, 116-1(b). To fulfill its mission, UNC must use resources efficiently "to ensure the highest quality in its service to the citizens of the State." <u>Id.</u> Members of the BOG are also expressly "charged with the responsibility of serving the best interests of the whole State." § 116-7(a). Additionally, the Fourth Circuit has recognized higher education as "an area of quintessential state concern and a traditional state governmental function." <u>Md. Stadium Auth.</u>, 407 F.3d at 265; <u>see also</u> <u>Richardson</u>, 118 F.3d at 455 (stating that "[t]here can be no doubt" that a state university's mission was "predominantly (if not primarily) aimed at addressing matters of state-wide concern"); <u>W. Va. Univ.</u>, 543 F.2d at 534 ("As the flagship university of the State of West Virginia, the University is clearly of statewide concern and interest."). UNC is clearly involved with statewide concerns. Thus, this factor, like the preceding factors discussed, weighs in

favor of finding that UNC and its constituent institutions, including UNC-Chapel Hill, are arms or alter egos of the State of North Carolina.

### 4. North Carolina law treats UNC and UNC-Chapel Hill as State entities

The final factor in the arm-of-the-state analysis considers how state law treats UNC. "Although the question of whether an entity is an alter ego of the state is a question of federal, not state, law, the manner in which state law addresses the entity remains 'important, and potentially controlling.'" Md. Stadium Auth., 407 F.3d at 265 (quoting Hall v. Med. Coll. of Ohio at Toledo, 742 F.2d 299, 304 (6th Cir. 1984)). Generally, where state law defines the entity as an "instrumentality" of the state, specifically reserves to the entity Eleventh Amendment immunity, and limits the statutes pursuant to which the entity can be sued, that entity will likely be determined to be an arm of the state. See id.

Numerous North Carolina statutes characterize UNC as a state entity, to include N.C. Gen. Stat. §§ 143C-1-1(d)(24), 143-128.3(a), 143-745(a)(2), 143-580, 143C-1-5, 130A-309.14, 105-164.3(43), and 143B-1385(b)(4). State statute also recognizes UNC's sovereign immunity, see N.C. Gen. Stat. § 116-11(13a) (explaining that the purchase of insurance by UNC "shall not be construed to waive sovereign immunity"), and governs its tort liability, subjecting state agencies, including UNC, to the North Carolina State Tort Claims Act[7], see N.C. Gen. Stat. § 143-291; Jones v. Pitt Cty. Mem'l Hosp., Inc., 410 S.E.2d 513, 514–15 (N.C. Ct. App. 1991) (explaining that the court lacked jurisdiction to hear plaintiff's tort claim against East Carolina University School of Medicine because, as a constituent institution of UNC, the legislature has

---

[7] The North Carolina Tort Claims Act bars claims against state agencies from being brought anywhere other than before the North Carolina Industrial Commission. N.C. Gen. Stat. § 143-291

provided in the State Tort Claims Act that jurisdiction over tort claims involving the State and its agencies is vested in the North Carolina Industrial Commission). Further, the North Carolina Constitution exempts land used by state agencies from public taxation, and this includes land owned by UNC. N.C. Const. art. V, § 2(3); see also N.C. Gen. Stat. § 116-16; In re Appeal of Univ. of N.C., 268 S.E.2d 472, 480 (N.C. 1980) ("We note . . . that property owned by [UNC] and property owned by private taxpayers is in no way similarly situated. The University is an agency of the State of North Carolina, thus property owned by UNC is in effect owned by the State."). In addition, employees of UNC are recognized as state employees. (Pruitt Decl. ¶¶ 2, 16; Fajack Decl. ¶ 5; Kidd Decl. ¶ 4); see also Blackburn v. Trs. of Guilford Tech. Cmty. Coll., 822 F. Supp. 2d 539, 548 (M.D.N.C. 2011) ("North Carolina courts appear to consider employees of the University of North Carolina system to be 'State Employees.'")

North Carolina courts have repeatedly characterized UNC as an agency of the State, including its constituent universities. See, e.g., Martinez v. Univ. of N.C., 741 S.E.2d 330, 332 (N.C. Ct. App. 2012) (referring to the UNC as "an agency of the State" in action involving constituent institution Winston Salem State University); Kawai Am. Corp. v. Univ. of N.C. at Chapel Hill, 567 S.E.2d 215, 217 (N.C. Ct. App. 2002) ("[UNC-Chapel Hill] is a state agency to which the doctrine of sovereign immunity applies"); Wood v. N. C. State Univ., 556 S.E.2d 38, 40 (N.C. Ct. App. 2001) ("NCSU is a State agency . . . [and] it is immune from suit unless its sovereign immunity has been waived."); Aune v. Univ. of N.C. at Chapel Hill, 462 S.E.2d 678, 683 (N.C. Ct. App. 1995) ("[D]efendants . . . share the governmental immunity enjoyed by the University, an agency of the State."); In re Envtl. Mgmt. Comm'n Final Order, 280

S.E.2d 520, 528 (N.C. Ct. App. 1981) (referring to UNC as an "arm of State government"); cf. Cox. v. Roach, 723 S.E.2d 340, 346 (N.C. Ct. App. 2012) ("As North Carolina extends sovereign immunity to its own public universities . . . .").

Because state law unequivocally treats UNC as a state agency, the final factor weighs heavily in favor of finding that UNC and its constituent institutions, including UNC-Chapel Hill, are arms or alter egos of the State of North Carolina.

## III. CONCLUSION

Considering the four factors articulated by the Fourth Circuit, UNC, and its constituent institutions, including UNC-Chapel Hill, are arms and alter egos of the State of North Carolina. As such, they are not "citizens" for purposes of diversity jurisdiction. Without diversity, this Court lacks subject matter jurisdiction to consider Plaintiffs' purely state law claims. Plaintiffs' Complaint must be dismissed without prejudice. See S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC, 713 F.3d 175, 185 (4th Cir. 2013) (stating that a dismissal for a defect in subject matter jurisdiction "must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits").

For the reasons stated above, the Court enters the following:

## ORDER

IT IS THEREFORE ORDERED that UNC-Chapel Hill's Motion to Dismiss (ECF No. 14) is GRANTED, and this action is DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Plaintiffs' Motion to File Second Amended Complaint (ECF No. 19) and UNC-Chapel Hill's Motion to Strike (ECF No. 31) are DENIED AS MOOT.

This, the 29th day of March, 2017.


     /s/ Loretta C. Biggs
United States District Judge